

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

United States Bankruptcy Judge

Signed August 25, 2010

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | CHAPTER 7 |
| RENAISSANCE HOSPITAL – GRAND | § | |
| PRAIRIE, INC., D/B/A RENAISSANCE | § | CASE NO. 08-43775-DML-7 |
| HOSPITAL – GRAND PRAIRIE, *ET AL.*, | § | |
| | § | JOINTLY ADMINISTERED |
| DEBTORS. | § | |

### Memorandum Opinion

Before the court is the disposition of remaining matters raised by the *Joint Motion Under Bankruptcy Rule 9019 to Approve Compromise and Settlement with First National Bank, N.A. and MetroBank N.A.* (the "9019 Motion")[1], filed by MetroBank, N.A.

---

[1]    The 9019 Motion gave rise to the instant dispute. The relief provided by this memorandum opinion was not specifically requested in the 9019 Motion, but the issues now before the court were joined at that time.

Given the procedural labyrinth described below, the 9019 Motion and the (resulting) Objections (as defined below) are the most appropriate pleadings to which to relate this memorandum opinion.

("MetroBank") and First National Bank, N.A. (collectively, the "Lenders").[2] By the 9019

Motion, Debtors[3] and the Lenders asked the court to approve a settlement relating to the

Lenders' liens on the Hospital.[4]

The court subsequently entered an order approving the settlement described in the

9019 Motion (the "Compromise Order"). By the Compromise Order the court lifted the

stay of section 362(a) of the Bankruptcy Code (the "Code"),[5] with respect to the Hospital

and certain personal property (the "Personal Property"), allowed the Lenders to foreclose

their liens on the Hospital and Personal Property, and required the Lenders to credit bid at

least $27,000,000 for the Hospital at a foreclosure sale.[6]

The Compromise Order also provided that any party could assert a superior

interest in the Hospital and the Personal Property by submitting documentation to

---

[2]      In pleadings filed after the 9019 Motion (specifically the Summary Judgment Motion (defined below)) the Lenders are referred to as: MetroBank, N.A. for itself and in its capacity as agent for First National Bank of Edinburg, Texas and Metro United Bank.

     The court cannot determine whether this inconsistency is a simple mistake, or if the lender parties actually changed. The outcome of the instant disputes would be the same in either case, and the ruling embodied in this memorandum opinion applies to the current group of lenders.

[3]      "Debtors" are Renaissance Hospital Grand Prairie, Inc. (08-43775-DML-7) ("RGP"), Renaissance Hospital Dallas, Inc. (08-43819-DML-7), Houston Community Hospital, Inc. (08-43820-DML-7), Renaissance Hospitals, Inc. (08-43821-DML-7), and Renaissance Healthcare Systems, Inc. (08-43822-DML-7).

     Although RGP's case is jointly administered with the cases of several other debtors, the disputes addressed by this memorandum opinion only relate to RGP.

[4]      The "Hospital" is comprised of real estate and improvements located at 2709 Hospital Boulevard, Grand Prairie, Texas.

[5]      11 U.S.C. §§ 101 *et seq.*

[6]      Debtors and the Lenders later asked the court, by motion, to amend the Compromise Order to reduce the amount they would be required to credit bid a foreclosure sale. The court denied that motion.

Debtors and the Lenders evidencing such superior interest[7] by February 5, 2009, or such later date as the parties agreed to, but not later than February 18, 2009. The Compromise Order further provided that if the Lenders disagreed with a party claiming a superior interest in the Hospital or Personal Property, the Lenders could file a notice describing the disputed priority issues by February 18, 2009.

On February 18, 2009, the Lenders filed their *Notice of Objections of MetroBank, N.A. and First National Bank of Edinburg, Texas to Lease and M&M Lien Claims* (the "Objections") by which they gave notice to the court of a number of disputed priority issues relating to the Hospital and the Personal Property, including disputes as to the priority of the liens of All Pro Glass & Mirror ("All Pro");[8] Polk Mechanical Company, LLC; JMC Mechanical, Inc. ("JMC"); AARK Companies, LLC ("AARK"); Jesus Vera d/b/a Elite Construction ("Elite"); Metropolitan Professional Electrical Services, Inc. d/b/a Metro Electric; Crescent Electric Supply Company ("Crescent"); Hajoca Corporation ("Hajoca") d/b/a Easter & Sons Supply ("Easter"); Innovative Plumbing Services, Inc. ("IPS"); and York International Corporation ("York") (collectively, the "Lien Claimants").

On February 23, 2009, the court held a hearing on the Objections (the "Objections Hearing"). During the Objections Hearing several of the parties that asserted that their liens were superior to those of the Lenders requested discovery, and the court suggested to the parties that they work together to establish a scheduling order allowing for discovery and setting a hearing on the priority disputes.

---

[7]     The Compromise Order did not require parties claiming priority of their liens over those of the Lenders to submit paperwork to the court.

[8]     All Pro settled with the Lenders on the eve of trial.

After the Objections Hearing the Lenders worked out settlements with some of the parties claiming liens superior to theirs, but failed to work out a resolution with the Lien Claimants. On July 24, 2009, the Lenders filed a motion asking the court to enter a scheduling order to dispose of the remaining priority disputes, including those with the Lien Claimants.

On August 10, 2009, the court entered a scheduling order (the "Scheduling Order") in which it set the instant disputes for hearing on December 14, 2009. The Lenders subsequently filed the *Lender's* [sic] *Motion for Summary Judgment* (the "Summary Judgment Motion"). On December 1, 2009, the court entered an amended scheduling order (the "Second Scheduling Order"), set the Summary Judgment Motion for hearing on December 14, 2009, suspended discovery until the Summary Judgment Motion was resolved, and set a hearing for any factual issues remaining after resolution of the Summary Judgment Motion for March 8, 2010.[9]

During the hearing on December 14, 2009, the court heard argument regarding the Summary Judgment Motion and, at its conclusion, took the Summary Judgment Motion under advisement. On December 29, 2009, the court issued a letter ruling (the "Letter Ruling") by which it granted the Summary Judgment Motion in part and directed counsel for the Lenders to submit a form of judgment.

Counsel for the Lenders subsequently submitted a form of judgment as required by the Letter Ruling. On January 26, 2010, after making modifications to the Lenders'

---

[9]  The Second Scheduling Order required that the Lenders file the Summary Judgment Motion no later than November 23, 2009 — a date that had already passed. This seeming chronological paradox arises because the Lenders filed a motion to amend the Scheduling Order on November 18, 2009, and uploaded the Second Scheduling Order as a proposed order contemporaneously with their motion. The court did not enter the Second Scheduling Order until December 1, 2009, but did not change the November 23, 2009, date because the Lenders had actually filed the Summary Judgment Motion by that date.

form, the court entered judgment (the "Prior Order") granting partial summary judgment to the Lenders.[10] The court subsequently entered another order amending the Scheduling Order (the "Third Scheduling Order") and set the unresolved issues relating to the 9019 Motion and the Objections for trial beginning on April 6, 2010. By the Third Scheduling Order, the court also bifurcated trial on the Lien Claimants' claims, reserving issues relating to removables for trial at a later date. Pursuant to the Third Scheduling Order, the outstanding issues remaining from the 9019 Motion (other than those relating to removables) and the Objections were tried to the court beginning on April 6, 2010, and continuing from time to time until May 6, 2010.[11]

The Lenders and Lien Claimants filed numerous briefs and stipulations of facts that are discussed below as necessary.

During the trial, the court received testimony from James Cornell, owner of JMC; Jesus Vera, owner of Elite; Kenneth Turner, owner of AARK; Micky Cable ("Cable"), owner of Metro Electric; Glenn Smith ("Smith"), owner of IPS; Walter Boggan ("Boggan"), the project manager of RGP's construction project; Richard Rucker, owner of All Pro; and Joseph Davin, a district manager for Crescent. The court admitted numerous exhibits of both the Lenders and the Lien Claimants, identified below as necessary. The parties also submitted designated portions of the depositions of James Curtis Martin, project superintendent for JMC; Cole Artzer, general manager of Easter; Marc Tompkins, a system sales engineer for Johnson Controls ("Johnson"), a division of York; Cody Hampshire, an HVAC systems sales engineer for Johnson; Terry Tangen, the

---

[10]    Findings embodied in the Letter Ruling and the Prior Order are discussed below as necessary.

[11]    The court conducted its evidentiary hearing on the following days: April 6, 7, 19, and 20, and May 6, 2010.

chief credit officer of MetroBank; Michael Smesny ("Smesny"), an executive of

Renaissance Healthcare Systems, Inc. ("RHS"), as well as CFO of various Debtors

during the time period relevant to the Motion; and James Scott Douglass ("Douglass"),

the attorney responsible for creating the corporate structure of Debtors and one of their

principals.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and

157(b)(2)(6). This memorandum opinion embodies the court's findings of fact and

conclusions of law. FED. R. BANKR. P. 7052 and 9014.


## I. Background[12]

On August 31, 2006, RGP the Hospital from DFW Grand Prairie Medical Center,

Ltd., pursuant to a special warranty deed with a vendor's lien. The special warranty deed

and vendor's lien were recorded in Tarrant County, Texas, on September 1, 2006. The

vendor's lien secured the payment of a note to the Lenders in the amount of $7,000,000.

The loan was also secured by a deed of trust, dated August 31, 2006 (the "DOT"),

recorded in the Tarrant County, Texas, deed records on September 1, 2006. In addition to

securing the initial $7,000,000 loan, the DOT also contained a future advances clause. In

the Prior Order the court concluded that the entirety of the Lenders' claim was secured as

of September 1, 2006 (the "Lenders' Inception Date").

---

[12]     By the Letter Ruling and the Prior Order, the court narrowed the issues for trial and made factual
findings which pertain to issues resolved by this memorandum opinion. The court subsumes the
Letter Ruling and the Prior Order into this memorandum opinion. In the Letter Ruling and the
Prior Order, the court specifically found facts relating to the amount and inception dates of the
Lenders' Lien; because these facts were established in the Letter Ruling and the Prior Order, and
prior to trial, evidence respecting these facts was not necessarily presented to the court during the
trial.

The plan was that RGP would renovate the Hospital — a substantial and costly task. After September 1, 2006, the Lenders, in furtherance of the renovation project, continued to loan RGP money from time to time pursuant to the future advances clause of the DOT.[13]

Debtors filed for protection under chapter 11[14] of the Code on August 21, 2008 (the "Petition Date"). As of the Petition Date the Lenders were owed $34,033,053.37.

## A. General Contract

At the time that RGP purchased the Hospital, Dan De La Garza ("De La Garza") was RGP's CEO, Smesny was its president, and Douglass was its secretary. Douglass Deposition, 17:17-18:5. RGP and RHS were both owned by one or more of De La Garza, Douglass and their families through family and individual trusts. *See* Douglass Deposition, 14:24-15:15, 40:8-41:6, 55:10-21, 56:24-57:4 and 144:21-145:4; Smesny Deposition, 16:13-16.

RGP did not retain a general contractor to oversee the renovation of the Hospital. However, Boggan was on site at the Hospital from the day that RGP took ownership of it (and from time to time prior to then) and acted as project manager on behalf of RGP.

---

[13]    The Lenders loaned RGP $6,000,000 in September of 2006, which loan was secured by a deed of trust dated September 14, 2006, that was recorded in the Tarrant County, Texas, deed records on October 9, 2006. In February of 2007 RGP entered into a construction loan facility of $33,000,000 with MetroBank which was secured by, *inter alia*, a deed of trust and security agreement dated February 6, 2007, that was recorded in the Tarrant County, Texas, deed records on February 22, 2007. Though the Lenders have multiple liens on the Hospital, for the purposes of this memorandum opinion and because the court ruled in the Letter Ruling and Prior Order that all of the Lenders' claims relate back to the Lenders' Inception Date, the court will refer to all of the Lenders' liens collectively as "the Lenders' Lien."

[14]    On September 9, 2009, Debtors' cases were, on their motion, converted to cases under chapter 7 of the Code.

Boggan answered to De La Garza and implemented his instructions. Douglass Deposition, 13:4-14:10; *see also* Smesny Deposition, 84:15-85:5.

Boggan was paid by and was an employee of RHS. Lien Claimants' exhibit 142, 10:10-22 and 21:22-4 (hereafter the Lien Claimants' exhibits will be referred to as LCX and a number). RHS and RGP are related entities and were classified as brother/sister corporations by Douglass, the attorney who formed them. *See* Douglass Deposition, 23:20-25; LCX 54 (containing a letter from Douglass, as president of Renaissance Hospitals, Inc., to the Texas Secretary of State consenting to RGP's use of "Renaissance Hospital" in its name, and describing RGP and "Renaissance Hospitals, Inc." as "affiliated corporation[s]"); LCX 53 (same as LCX 54, but for RHS). There was neither a formal, written contract, nor an informal, unwritten contract providing for RHS to act as general contractor for RGP. Douglass Deposition, 22:23-25:2; *see also* Smesny Deposition, 85:13-17.

The individual contractors, including the Lien Claimants, that worked on the Hospital were employed as contractors by RGP.[15] *See* Douglass Deposition, 77:7-78:7. Contractors that worked on the Hospital were paid from various bank accounts of Debtors, depending on which of Debtors had money at the time; contractors were not paid from RGP's accounts because RGP was not yet operating. They were generally paid from the accounts of Renaissance Hospital Dallas, Inc., because of its proximity to the Hospital, but could have just as easily been paid from other of Debtors' accounts. Smesny Deposition, 60:4-63:4.

---

[15]     It is possible that RHS may have signed some contracts in order to hire contractors to work on the Hospital. If this happened, however, RHS hired any such contractors on behalf of, and as agent for RGP. Douglass Deposition, 80:7-81:14.

Except for Metro Electric, IPS and All Pro, the court has no evidence of a subcontractor doing work at the Hospital prior to the Lenders' Inception Date. While other of the Lien Claimants inspected the Hospital prior to that time at Boggan's (or De La Garza's) request, actual work by them did not occur until after September 1, 2006.

## B. Metro Electric and Crescent

Cable first visited the Hospital on June 6, 2006, at the request of Boggan. During this visit, Cable examined a switchgear[16] that had preexisting damage. At Boggan's request,[17]Cable spent the next few days working on the switchgear. Trial Transcript, 4/6/2010, 17:8-18:2; *see also* LCX 107.[18] While working on the switchgear, Cable and his workers installed various parts onto the switchgear including lugs, fuses, and wires.

During the same time period, Boggan asked Cable to determine why the sump pumps that were located in the tunnels under the Hospital had failed. Cable and his workers inspected the sump pumps and installed approximately 175 feet of new electrical wiring to power them. They were, however, unable to fix the sump pumps because the "pump motors were bad." Trial Tanscript, 4/6/2010, 21:4-14.

In late July, or early August of 2006, Boggan asked Cable to repair the security lights located at the north tower of the Hospital. On August 2, 2006, one of Cable's

---

[16]     A switchgear is similar to a very large breaker box. Trial Transcript, 4/6/2010, 17:17-18:1.

[17]     Acquisition of the Hospital was anticipated

[18]     LCX 107 is composed of invoices for building supplies and Metro Electric employee time cards. The document labeled MPE 02470 is the time log of Jeff Yount ("Yount"), a Metro Electric employee, who assisted Cable in repairing the switchgear. Yount listed "DFW Memorial Hospital" as the job name under the column entitled "Customer/Job Name." Cable testified that Yount so labeled the job because that was the name on the sign that was in front of the Hospital at the time. *See* Trial Transcript, 4/6/2010, 22:2-17.

workers, Jason Vasquez, worked to repair security lights.[19] Trial Transcript, 4/6/2010, 23:19-25.

On January 15, 2008, Metro Electric filed an affidavit claiming a mechanic's and materialmen's lien[20] in the County Clerk's Office of Tarrant County. LCX 101. Crescent subsequently filed an affidavit claiming an M&M Lien in the County Clerk's Office of Tarrant County on March 14, 2008. LCX 49. Crescent's lien is for materials supplied to Metro Electric during renovation of the Hospital and all amounts claimed by Crescent's lien are included in Metro Electric's lien. Trial Transcript, 4/6/2010, 44:8-45:5.

## C. IPS and Easter

During the Hearing, Smith testified that he initially visited the Hospital in June of 2006 to determine the scope of work that needed to be done. At the end of July or beginning of August, 2006, IPS began work at the Hospital. Initially, Boggan charged IPS with restoring water service to the Hospital and with repairing a bathroom. In furtherance of these tasks, IPS supplied copper, cast iron and miscellaneous fittings. Trial Transcript, 4/7/2010, 6:20-7:16.

---

[19]  The court cannot determine from the evidence in the record whether the lights were actually returned to working condition.

[20]  Mechanic's and materialmen's liens ("M&M Liens") are liens granted pursuant to section 53.021 of the Texas Property Code which provides in part that a person is entitled to a lien if:

(1) the person labors, specially fabricates material, or furnishes labor or materials for construction or repair in the state of:

(A) a house, building, or improvement. . .

Tex. Prop. Code Ann. § 53.021 (2010).

IPS billed for the work it completed in July and August of 2006 on September 14, 2006. LCX 63.[21] IPS regularly gave its bills to Boggan who would then pay them. Smith testified that it was IPS's practice to bill for work after it was completed and that Boggan frequently did not receive IPS's bills for two or three weeks after work had been completed. *See* Trial Transcript, 4/7/2010, 31:23-33:14.

IPS filed an affidavit claiming an M&M Lien in the County Clerk's Office of Tarrant County on February 12, 2008. LCX 59. IPS subsequently assigned a portion of its lien to Easter because Easter supplied IPS with materials that were used in renovating the Hospital. LCX 61; Trial Transcript, 4/7/2010, 21:25-22:17. Easter also filed an M&M Lien in the County Clerk's Office of Tarrant County on February 1, 2008.[22] LCX 60.

## II. Discussion

M&M Liens have priority over any mortgage that is perfected after work has been commenced by the laborer or contractor that is claiming the M&M Lien. Tex. Prop. Code Ann. § 53.021 (2010); *McConnell v. Mortgage Investment Co. of El Paso*, 305 S.W.2d 280, 283 (Tex. 1957). Absent a general contract, each laborer's lien relates back to the date that he or she either (1) commenced work giving rise to his or her lien, or (2) delivered materials to the land on which the work occurs. *Suntex Fuller Corp. v. Flint*

---

[21]    The Lenders objected to LCX 63 because it was not timely produced to them. The court initially sustained the Lenders' objection. Later in the trial the Lenders asked several questions about LCX 63, causing the court to modify its prior ruling and to partially admit the exhibit.

LCX 63 is a photocopy of IPS's bill and a credit card receipt. Only the portion of the exhibit representing the bill was admitted into evidence.

[22]    IPS's partial assignment of its lien to Easter, and Easter's own lien filing were actually assigned and filed, respectively, to and in the name of Hajoca. Hajoca does business under Easter's name. For convenience, the court refers to Hajoca's liens as those of Easter.

The court cannot determine from the evidence before it whether the amounts claimed through Easter's lien are included in IPS's lien.

*Mortgage Group*, 2007 WL 1018637, *2 (Tex. App. – Houston [1st Dist.] April 5, 2007, no pet.). If, however, there is a general contract regarding construction of improvements, the time of inception of all M&M Liens arising for the purpose of fulfilling that general contract will relate back to the date that the first subcontractor began work or the first materialman delivered materials. *McConnell*, 305 S.W.2d at 283; *Oriental Hotel Co. v. Griffiths*, 33 S.W. 652 (Tex. 1895); *Suntex*, 2007 WL 1018637 at *3.

A creditor asserting that it has a senior lien must prove, by a preponderance of the evidence, the validity and priority of its lien. *See, e.g., Madison Inv. Trust v. Covenant at S. Hills, Inc. (In re Covenant at S. Hills, Inc.)*, 410 B.R. 426, 430 (Bankr. W.D. Pa. 2009) (A creditor "has the burden of proof to a preponderance of the validity, priority and extent of its asserted lien."); *c.f. Allegheny-Ludlum Brackenridge Fed. Credit Union v. Fassinger (In re Fassinger)*, 246 B.R. 513 (Bankr. W.D. Pa. 2000) (in a proceeding under 11 U.S.C. § 506, the burden is on the creditor to prove the extent of its lien). A fact is proven by a preponderance of the evidence if the finder of fact — here the court — finds it is more likely than not, based on the evidence, that the fact is true. *See, e.g., In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 909-10 (5th Cir. 1993) (Parker, D.J., sitting by designation, concurring in part and dissenting in part).

Many of the Lien Claimants stipulated, by their *Mechanic's and Materialmen's Lien Claimant's Stipulations* (the "Stipulation") (Dkt. No. 1430), that they, individually, did not begin work on, or deliver materials to the Hospital until after the Lenders'

Inception Date. For the purposes of this memorandum opinion, the court assumes without

so holding that the stipulating lien claimants are not bound by the Stipulation.[23]

---

[23] Neither Metro Electric or IPS (acting for itself) so stipulated, but Crescent and Easter did so stipulate. Thus, even if the court did bind the Lien Claimants to the Stipulation, the outcome of the case would be the same.

In the Stipulation, Metro Electric stipulated that the date it "performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was before September 1, 2006."

In the Stipulation, IPS is shown to have stipulated that the date it "performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was on or after October 9, 2006 but before February 22, 2009." While it appears that IPS stipulated that it did not begin work until after the Lenders' Inception Date, this is not the case. IPS did not sign the Stipulation. The Stipulation was signed by attorney Misti Beanland for Crescent, Easter and IPS. However, IPS was not Ms. Beanland's client — her signature on behalf of IPS appears because IPS assigned part of its claim to Easter, one of Ms. Beanland's clients, as payment for materials that Easter provided to IPS. Because IPS was not Ms. Beanland's client, she could not bind IPS. *See* 7 Am. Jur. 2d *Attorneys at Law* § 147 (2010) ("A lawyer may not act beyond the scope of the contemplated representation without additional authorization from the client.").

In the Stipulation, Crescent stipulated that the date it "performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was on or after September 2, 2006 but before October 9, 2006." Because the court, as discussed below, finds that Crescent did not deliver materials to the Hospital until after the Lenders' Inception Date, the outcome of not holding Crescent to the Stipulation is the same as if the court had held Crescent to the Stipulation — the Lenders' Lien has priority over Crescent's M&M Lien. The evidence before the court shows that the first day that Crescent delivered materials to the Hospital was June 4, 2007, after the Lenders' Inception Date. LCX 50 (Bates No. 01293) (an invoice dated 6/5/2007 showing a shipping date of 6/4/2007 and that the invoiced goods were shipped via "CRESCENT TRUCK"). While there is one invoice (dated August 2, 2006) (LCX 52) that predates the Lenders' Inception Date, under the "Ship Via" heading it shows "COUNTER," meaning the invoiced materials were picked up.

In the Stipulation, Easter stipulated that the date it "performed its first visible work or delivered its first visible materials (as defined by section 53.124 of the Texas Property Code and Texas case law) was on or after October 9, 2006 but before February 22, 2009." Because the court, as discussed below, finds that Easter did not deliver materials to the Hospital until after the Lenders' Inception Date, the outcome of not holding Easter to the Stipulation is the same as if the court had held Easter to the Stipulation — the Lenders' Lien has priority over Easter's M&M Lien. The evidence before the court shows that the first day that Easter delivered materials to the Hospital was August 30, 2007, after the Lenders' Inception Date. LCX 62 (Bates No. 00025) (an invoice dated 8/30/2007 showing a shipping date of 8/30/2007 and that the invoiced goods were shipped via "OT [sic] OUR TRUCK"). While there is one invoice (LCX 62 (Bates No. 00024)) that predates the August 30, 2007, invoice, under the "Ship Via" heading it shows "WC WILL CALL," meaning the invoiced materials were picked up. However, even if the materials represented by the earlier invoice were shipped, their shipping date of August 28, 2007, is well after the Lenders' Inception Date.

The court here reaches no conclusion respecting the effect of Easter's (and its counsel's) stipulation, as assignee of IPS, on behalf of IPS.

As discussed below, the court finds that a general contract relationship did not exist during the renovation of the Hospital. Therefore, the court only analyzes the claims of those Lien Claimants with credible evidence that they commenced work before the Lenders' Inception Date — Metro Electric and its material supplier Crescent, and IPS and its material supplier Easter.

## A. General Contract

A general contractor must be a third party; an owner performing the usual functions of a general contractor does not support the existence of a general contract that will allow all M&M Liens to relate back. *See McConnell*, 305 S.W.2d at 283-6 (discussing various cases, including *Oriental Hotel*, in which the *McConnell* Court states, courts have ruled that when an owner does the work of a general contractor, M&M Liens do not relate back).

"General contract" is not defined in either *McConnell* or the Texas Property Code. Case law and the Texas Property Code make it clear that construction contractual relationships, including general contractor relationships, do not need to be evidenced in writing and that they can arise through oral contracts. *In re Moussa*, 93 B.R. 96, 99 (Bankr. N.D. Tex. 1988) ("Section 53.124(a)(2) of the Property Code expressly allows oral contracts…"); *Purdin v. Jenkins*, 337 S.W.2d 418 (Tex. Civ. App. – Dallas 1960, no writ) ("Construction contracts are not required to be in writing to be valid; and though oral they may be secured by mechanic's liens unless homesteads are involved.").

Construction contracts, including those between general contractors and owners, are governed by standard contract law principles. *Raymond v. Rahme,* 78 S.W.3d 552,

561 (Tex. App. – Austin 2002, no pet.); *Quantum Elec., Inc. v. Scott & White Props.*,

2007 Tex. App. LEXIS 8415 (Tex. App. – Eastland Oct. 25, 2007, no pet.); 10 Tex. Jur.

*Building and Construction Contracts* § 1 (2010). Standard contract law principles require

that a contract be definite and certain, and that there be among the parties a meeting of

the minds. *See, e.g., Taylor v. Bush (In re Taylor & Assocs., L.P.)*, 249 B.R. 431, 447

(E.D. Tenn. 1997); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.

1992); *Winchek v. Am. Express Travel Related Servs. Co.*, 232 S.W.3d 197 (Tex. App. –

Houston [1st Dist.] 2007, no pet.).

   In the case at bar, the Lien Claimants would have the court infer that RHS,

through Boggan, acted as general contractor for RGP during renovation of the Hospital.

The parties do not dispute that there was not a written contract establishing RHS as

general contractor for RGP. The Lien Claimants, however, would maintain that the facts

of the case make it clear that RHS did, in fact, serve as general contractor for RGP.

   In the *Lien Claimants' Second Trial Brief*, the Lien Claimants cite to several

documents and to deposition testimony from Douglass and Smesny as evidence that RHS

acted as the general contractor for RGP. The Lien Claimants specifically point to exhibits

A11, A12, A21, A22, A25, A26, and A27, which are sub-exhibits to LCX 142, the

transcript of Boggan's deposition, exhibits E6, E9, and E19, which are sub-exhibits to

LCX 143, the transcript of Smesny's deposition, LCX 7, and LCX 88. The Lien

Claimants cite to the above listed sub-exhibits, with the exception of E9, because they

refer to either "Renaissance Healthcare" or RHS as the "contractor" for the Hospital

renovation.[24]

---

[24]     The Lien Claimants cite sub-exhibit E9 because it refers to Boggan as "Director of Engineering, Renaissance Healthcare Systems."

The court questions the care used in creating, and so the probative effect of, the A and E exhibits, and notes that exhibits A12, A25, A26, A27, E6, and E19 list the owner of the Hospital as "Renaissance Healthcare Systems." Renaissance Healthcare Systems did not own either the Hospital, or RGP; RGP owned the Hospital, and RGP was, in turn, owned by De La Garza and Douglass through their individual and family trusts. *See* Douglass Deposition, 14:24-15:15, 40:8-41:6, 55:10-21, 56:24-57:4 and 144:21-145:4; Smesny Deposition, 16:13-16. LCX 7 and LCX 88 both list "Renaissance Healthcare" as both contractor and owner. These exhibits are flawed in the same way as the A and E exhibits — "Renaissance Healthcare" did not own either the Hospital or RGP.

Exhibits A21 and A22 list RHS as the contractor; however, they were filled out by Boggan. Boggan testified during his deposition that during the time period that he worked for RHS, he did not know that RHS and RGP were separate legal entities and that RGP owned the Hospital. Boggan even testified that, at the time, he believed RHS owned and operated all of the Debtors' hospitals. LCX 142, 20:11-19. Because the person who filled out the exhibits, Boggan, was unaware of the ownership structure of RGP, RHS, and the other Debtors, the probative value of these exhibits is limited. Certainly a meeting of the minds between RHS and RGP cannot be inferred from this evidence.

During his deposition, Boggan testified that he did not have to fill out any information forms regarding ownership of the Hospital for any of the contractors involved in the litigation at bar because the contractors already knew who the owner was. He further testified that some contractors who are not litigants required ownership information and that De La Garza provided that information. LCX 142, 85:16-86:7. Boggan also testified that De La Garza directly supervised and instructed him about what

he wanted done during the renovation. *See* LCX 142, 115:17-116:8. At trial, Boggan testified that De La Garza made the final decision as to whom to hire as contractors for the Hospital and that De La Garza made the final decisions as to what renovations needed to be done. De La Garza's actions during renovation of the Hospital, and Boggan's perception of De La Garza's role in the renovation make it clear to the court that De La Garza, the principal of RGP, was the ultimate decision maker regarding the Hospital's renovations; thus Boggan's misuse of RHS's name as contractor is not helpful to the Lien Claimants.

Douglass corroborated Boggan's testimony during his deposition, testifying that Boggan represented RGP during the renovation of the Hospital. Douglass Deposition, 14:7-10. He further testified that Boggan reported to De La Garza and that he (Boggan) implemented De La Garza's decisions. Douglass Deposition, 13:9-17. Finally, Douglass testified that to his knowledge there was never a general contractor for the Hospital and that he never reviewed a general contract. Douglass Deposition, 16:3-13; 18:6-18.

As has been discussed previously, standard contract principles apply to construction contracts, including those between owners and general contractors. *See, e.g., Raymond*, 78 S.W.3d at 561. Standard contract principles require that there be a meeting of the minds between the contract parties. *See, e.g., Taylor*, 249 B.R. at 447. Douglass, as the attorney that formed the Debtor entities and as secretary of the Debtor entities, including RGP, would have had personal knowledge if a general contractor arrangement existed, or if the parties intended to create a general contractor relationship between RHS and RGP.

During his deposition, Boggan testified that he did not have any knowledge of RGP ever paying RHS a fee for renovating the Hospital. LCX 142, 77:12-5. Smesny also testified, during his deposition, that he did not have any knowledge of RGP ever paying a fee to RHS for acting as general contractor during the renovation of the Hospital. Smesny Deposition, 51:15-20. Standard contract principles require that there be consideration for a contract to be valid. *Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997). Consideration can come in several forms, but one of the most common is payment of money. *See* 17A Am. Jur. 2d *Contracts* § 136 (2010). The court does not have any evidence before it of RGP providing consideration, either in monetary or any other form, to RHS for acting as its general contractor.

For the forgoing reasons, the court finds and concludes that RHS did not act as general contractor for RGP during the renovation of the Hospital. The court further finds and concludes that Boggan, individually, did not act as a general contractor during the Hospital's renovation. Finally, the court concludes that De La Garza was the ultimate decision maker during the renovations and that he acted as and on behalf of RGP, as an owner/builder. The court thus finds and concludes that, there being no general contract respecting renovation of the Hospital, the M&M Liens of the Lien Claimants that commenced work after the Lenders' Inception Date cannot relate back prior to that date.

## B. Metro Electric Lien Claims

As stated above, absent a general contract, M&M Liens relate back to the date that either (1) work was first started, or (2) materials were first delivered to the jobsite. *Suntex*, 2007 WL 1018637 at *2. The Texas Property Code expressly allows for M&M

Liens for persons that furnish labor or materials for repair of a building. Tex. Prop. Code Ann. § 53.021 (2010). It is logical that if M&M Liens relate back to the date that work was first undertaken for new construction, they would also relate back to the date that work was first undertaken for repairs in aid of a renovation such as the renovation of the Hospital.

At the very latest, Metro Electric began working to repair the Hospital's switchgear[25] on June 8, 2006, a task that was a necessary step in the Hospital's renovation, well before the Lenders' Inception Date. *See* LCX 107; *see also* the Prior Order. At trial, Cable testified that Metro Electric was required to supply various materials in order to repair the switchgear.

The court does not have any evidence before it as to whether Metro Electric's attempted repairs of the switchgear were actually successful; however, section 53.021 of the Texas Property Code does not require that repairs or construction be successful in order for a person to be entitled to an M&M Lien.[26] Because Metro Electric began work at, and supplied materials for use in, the renovation of the Hospital (either of which, alone, would support the relation back of an M&M Lien) well before the Lenders' Inception Date, Metro Electric's M&M Lien is entitled to priority over the Lenders' Lien.

---

[25] Some courts have held that a contractor that repairs a chattel is not entitled to an M&M Lien. *Advance'd Temps., Inc. v. Reliance Sur. Co.*, 165 S.W.3d 1 (Tex. App. – Corpus Christi 2004, pet. granted) (aff'd on other grounds *Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46 (Tex. 2007) (citing *South Coast Supply Co. v. A & M Operating Co (In re A & M Operating Co.)*, 182 B.R. 986 (Bankr. E.D. Tex. 1993))).

During trial, Cable testified that the switchgear "supplied [power to] the entire north [sic] wing of the property." Trial Transcript, 4/6/2010, 17:17-18:1. The court, therefore, finds and concludes that the switchgear does not constitute a chattel because it was part of the electrical system without which the electrical system would not work.

[26] Metro Electric's work on the sump pump, also occurring before the Lenders' Inception Date, would thus also serve for its M&M Lien relate to back.

**C. IPS Lien Claims**

The Lien Claimants must prove by a preponderance of the evidence that IPS's M&M Lien has priority over the Lenders' Lien. *See Madison Inv. Trust*, 410 B.R. at 430. In order to so prove, the Lien Claimants must show that it is more likely than not that IPS's M&M Lien has priority, s*ee Bell*, 3 F.3d at 909-10, *i.e.*, had its inception prior to the Lenders' Inception Date.

Smith testified that IPS began work at the Hospital at the end of July or beginning of August, 2006. To support this claim the Lien Claimants offered their exhibit 63 which is IPS's bill for inspecting the Hospital and repairing one of its bathrooms. The copy of the bill that is LCX 63 is dated September 14, 2006, a date that is over two weeks after the Lenders' Inception Date.

Smith testified that it was IPS's practice to bill Debtors after IPS had completed the work represented by the bill, and that he often waited two or three weeks before submitting a bill for work that had been completed. *See* Trial Transcript, 4/7/2010, 31:23-33:14. The Lenders presented no evidence contradicting Smith's testimony and Smith appeared to the court to be a credible witness; the court, therefore, finds Smith's testimony regarding when IPS commenced work and its customs regarding billing to be credible.

The Lenders could argue that IPS's M&M Lien should not relate back to when it first performed work at the Hospital because IPS was paid for the work that it performed prior to September 1, 2006, shortly after the work was completed and before IPS began any new work. A property owner can limit the scope of an M&M Lien by securing the

services of a contractor under separate contracts. *In re Waller Creek, Ltd.*, 867 F.2d 228, 235 (5th Cir. 1989). In the case at bar, the owner and its agents did not limit the scope of IPS's work under separate contracts. Smith testified that IPS restored water to the Hospital during July or August of 2006, in order to inspect what else needed to be done. He further testified that in order to restore water to the Hospital, IPS had to patch some small leaks. Trial Transcript, 4/7/2010, 51:17-52:8. After September 1, 2006, IPS continued to work on the renovation of the Hospital; this work was clearly dependent on IPS's prior work — it would have been impossible for IPS to determine the work that needed to be done without first restoring water service to the Hospital.[27]

The Lien Claimants have proven by a preponderance of the evidence that IPS began work at the Hospital prior to the Lenders' Inception Date. The M&M Lien of IPS is, therefore, entitled to priority over the Lenders' Lien.


**D. Crescent and Easter Lien Claims**

Though they delivered no materials to the site of the Hospital before the Lenders' Inception Date, Crescent and Easter supplied materials to Metro Electric and IPS, respectively. Their M&M Liens do not, however, relate back to the dates on which Metro Electric's and IPS's M&M Liens arose because the relation back doctrine must be narrowly construed. *Suntex*, 2007 WL 1018637 at *3 (**"**The relation back doctrine should be narrowly and cautiously applied and not expanded to apply to factual situations not strictly analogous to those existing in *Oriental.*"). Crescent and Easter must, therefore,

---

[27] The court recognizes that merely inspecting pipes would not be sufficient to support an M&M Lien's inception date. In the case at bar, IPS did more than merely inspect pipes (other than repair the bathroom); it also repaired some minor leaks — an endeavor which clearly required actual labor.

rely on the dates on which their own M&M Liens arose — both of which, as discussed above in footnote 23, are after the Lenders' Inception Date. However, to the extent they are entitled to do so, Crescent and Easter may pursue collection of amounts owed to them from Metro Electric and IPS.

## III. Conclusion

The Lien Claimants failed to prove by a preponderance of the evidence that a general contractor supervised renovation of the Hospital. De La Garza acted, on behalf of RGP, as owner/builder during renovation of the Hospital.

Metro Electric and IPS both proved by a preponderance of the evidence that they began work at the Hospital prior to the Lenders' Inception Date. None of the other Lien Claimants produced credible evidence that they began work at, or delivered materials to the Hospital prior to the Lenders' Inception Date. Because there was not a general contractor supervising renovation of the Hospital, only Metro Electric's and IPS's M&M Liens have priority over the Lenders' Lien.

Crescent's and Easter's M&M Liens do not relate back to those of Metro Electric and IPS, but they may pursue collection of amounts owed to them by Metro Electric and IPS to the extent they are entitled to do so under the law. The court reaches no conclusion respecting the effect of Easter's joinder in the Stipulation (including its affect on its rights respecting IPS's lien).

For the above stated reasons, the 9019 Motion must be granted to the extent described in this memorandum opinion, and the Objections must be sustained as to all of

the Lien Claimants but Metro Electric and IPS — the Objections, as they pertain to Metro Electric and IPS are overruled.

Counsel for the Lien Claimants are instructed to agree with counsel for the Lenders on, and submit to the court, a form of judgment consistent with this memorandum opinion within 30 days. If the parties cannot agree to the form of judgment, each side may submit a proposed form of judgment by hard copy to the court's chambers.

### END OF MEMORANDUM OPINION ###